**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARTHUR L. HUDSON et al.** | : | **CIVIL ACTION**[1] |
| | : | |
| **v.** | : | **No. 10-6401** |
| | : | **No. 10-5481** |
| **SUN NATIONAL BANK et al.** | : | **No. 11-0432** |

## MEMORANDUM

PRATTER, J.

**AND NOW**, this 25th day of July, 2014, upon consideration of Sun National Bank's ("Sun") Motion for Summary Judgment ("MSJ," Docket No. 121), Mr. Hudson's, Mrs. Hudson's, and Mrs. Zysk's ("the Individual Defendants") various Responses in Opposition (Docket Nos. 122, 123, & 124), Sun's Reply (Docket No. 127), oral argument held on July 8, 2014, and the subsequent correspondence from the parties (Docket Nos. 129, 131, 132, & 133), **the Court hereby ORDERS that the Motion is GRANTED for the following reasons:**

On January 16, 2006, Arthur Hudson and Francis Zysk borrowed $2,000,000.00 from Sun National Bank.[2] As collateral for the two loans ("Notes"), Mr. Hudson and Mr. Zysk pledged the assets of Rapid Circuits, Inc. ("RCI"),[3] each of their homes,[4] and their individual

[1] The actions under these three docket numbers were consolidated. This Memorandum and the accompanying Order of Judgment should be filed on all three dockets to provide absolutely clear notice of the final outcome of this litigation.

[2] U.S. Small Business Administration Note, SBA Loan # 950-290-4006 (MSJ Ex. 1 (Docket No. 121-4, at 1-8)) ($1,650,000.00) [hereinafter "Note 1"]; U.S. Small Business Administration Note, SBA Loan # 950-291-4009 (MSJ Ex. 3 (Docket No. 121-5, at 1-7)) ($350,000.00) [hereinafter "Note 2"]. Notes 1 and 2 contain many of the same terms; in these cases, citations in this Memorandum may refer to shared sections of the "Notes."

[3] RCI Mortg. (MSJ Ex. 2 (Docket No. 121-4, at 9-40)); RCI Mortg. (MSJ Ex. 4 (Docket No. 121-5, at 8-39)).

[4] Zysk Mortgs. (Docket No. 97, Ex. 4, at 40-42). The Hudson mortgages are not in the record, and only the first page of each of the two Zysk mortgages are in the record. Still, as

investment accounts.[5] Additionally, their wives, Theresa Hudson and Lorraine Zysk, guaranteed the Notes up to the amount of their community and spousal interests in each of the assets pledged by their husbands.[6] In February 2006, Sun sold part of one of the Notes to a third party.[7]

Both Notes were in default by January 2007, but because payments were still being made, Sun did not take immediate action. Mr. Hudson and Mr. Zysk stopped making payments altogether in 2010. Sun then collected $3,107.08 from RCI's debtors and deducted this amount from the remaining debt on the Notes.[8] In August 2010, Sun liquidated the Hudsons' and Zysks' investment accounts consistent with the "Rights and Remedies" clauses of the agreements controlling the pledge of those securities and applied the resulting sums to the debt.[9]

Sun sued RCI and the Individual Defendants for the balance on the Notes. On May 2, 2013, the Court entered default judgment against RCI and in favor of Sun for the then-current balance of $2,092,696.71.[10]

---

clarified at the July 8, 2014 oral argument, there is no dispute by the Hudsons or Zysks that they did mortgage their homes for the aggregate sum of $2,000,000.00 to Sun National Bank.

[5] Commercial Pledge and Security Agreement, MSJ Ex. 9 (Docket No. 121-6, at 29-40).

[6] U.S. Small Business Administration Unconditional Limited Guarantee (Docket No. 97, at 27-31) (Theresa Hudson, up to $1,650,000.00) [hereinafter "Hudson Guarantee 1"]; U.S. Small Business Administration Unconditional Limited Guarantee (MSJ Ex. 8 (Docket No. 121-6, at 15-21)) (Theresa Hudson, up to $350,000.00) [hereinafter "Hudson Guarantee 2"]; U.S. Small Business Administration Unconditional Limited Guarantee (Docket No. 97, at 15-20) (Lorraine Zysk, up to $1,650,000.00) [hereinafter "Zysk Guarantee 1"]; U.S. Small Business Administration Unconditional Limited Guarantee (MSJ Ex. 8 (Docket No. 121-6, at 23-28)) (Lorraine Zysk, up to $350,000.00) [hereinafter "Zysk Guarantee 2"]. When the Guarantees share language under the same sections, they may be referred to collectively.

[7] Feb. 10, 2006 Mem. Regarding Sale (Docket No. 124, at 27).

[8] July 9, 2014 Sun Letter 4 (Docket No. 131).

[9] *See* Mar. 21, 2014 Order 3 n.3 (Docket No. 112); Sun Letter (undated) (Docket No. 92-3, at 25-28). July 9, 2014 Sun Letter 4 (Docket No. 131).

[10] May 1, 2013 Order (Docket No. 89).

Sun has continued to pursue the Individual Defendants as jointly and severally liable on the debts, and its Motion for Summary Judgment is now before the Court. Sun claims that it is entitled to hold Mr. Hudson liable, as a debtor, for the full amount of the remaining debt, and Mmes. Hudson and Zysk, as guarantors, for the outstanding debt not to exceed the community property or spousal interest in the collateral pledged.[11] The Court agrees.

To prevail on a claim for breach of contract, the plaintiff must establish (1) the formation of a contract and its essential terms, (2) a breach of a duty imposed by that contract, and (3) damages resulting from that breach. *E.g.*, *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005). "The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). And "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed." *E. Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965) (per curiam); *accord, e.g.*, *Murphy*, 777 A.2d at 429 ("Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties.").

The primary commercial relationship at issue here is dominated by Mmes. Hudson's and Zysk's Guarantees to Sun. A guaranty is similar to a contract: "In ascertaining the meaning of the language of a guaranty contract, the same rules of construction apply as in the case of other contracts," and "[t]he nature and extent of the liability of a guarantor depends on the terms of the contract of guaranty." *Paul Revere Protective Life Ins. Co. v. Weis*, 535 F. Supp. 379, 386 (E.D. Pa. 1981), *aff'd*, 707 F.2d 1403 (3d Cir. 1982). *See also generally, e.g.*, *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 652 F. Supp. 2d 599, 608 (E.D. Pa. 2009).

[11] Mr. Zysk received a bankruptcy discharge and is no longer a party to this lawsuit. *See* Mar. 21, 2014 Order 4 (Docket No. 112); Stipulation of Dismissal as to Defendant Francis E. Zysk (Docket No. 118).

There are no disputes of material fact here.[12] The record indisputably shows that a contract was formed—the Notes—when Messrs. Hudson and Zysk agreed to borrow $2,000,000.00 from Sun National Bank secured by collateral and to be repaid at a defined variable interest rate over a period of years.[13] One Note explicitly stated that, "[i]n return for the Loan, Borrower [RCI and Messrs. Hudson and Zysk] promises to pay to the order of the Lender the amount of ONE MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note";[14] the other contained the identical promise but for $350,000.00.[15] In the event of a default—which occurs "if Borrower does not make a payment when due,"[16] then Sun is entitled not only to "[r]equire immediate payment of all amounts owing under th[e] Note[s],"[17] but also to "[f]ile suit and

[12] Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); that is, it should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party," *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Of course, "a court may not weigh the evidence or make credibility determinations," *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), but "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it," Fed. R. Civ. P. 56(e). "If the evidence [offered by the party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

[13] The $1,650,000.00 note was to mature in twenty years; the $350,000.00 note was to mature in two years.

[14] Note 1, *supra* note 2, § 1.

[15] Note 2, *supra* note 2, § 1.

[16] Notes, *supra* note 2, § 4.

[17] Notes, *supra* note 2, § 5(A).

obtain judgment,"[18] as it seeks to do here. Sun may "[c]ollect all amounts owing from *any* Borrower or Guarantor."[19] And, further, Sun is entitled to hold Mr. Hudson liable for "reasonable attorney's fees and costs" associated with "enforc[ing] the terms of th[e] Note."[20]

Mmes. Hudson and Zysk agreed to guarantee these Notes and signed documents stating that each would be responsible for the loan on the Notes up to the value of her interest in her respective collateral (home and investment accounts): "Guarantor unconditionally guarantees payment to the Lender of all amounts owing under the Note, as limited below. Guarantor must pay all amounts owing under this Guarantee when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor."[21] The "as limited below" language refers, of course, to section 4's "PAYMENT LIMITATION" of the "guarantee . . . to Guarantor's community property or spousal interest in collateral pledged to secure the Note or any guarantee,"[22] i.e., to Mrs. Hudson's and Mrs. Zysk's homes and investment accounts, respectively. And as under the Notes, Sun can require Mmes. Hudson and Zysk to "pay all expenses [Sun] incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs."[23]

When Messrs. Zysk and Hudson stopped making payments on the Notes, they breached the contract, thereby also triggering Mmes. Zysk's and Hudson's liability under their respective Guarantees.

---

[18] Notes, *supra* note 2, § 5(C). Sun was also entitled to "[t]ake possession of any Collateral" and "sell, lease, or otherwise dispose of [it] at public or private sale, with or without advertisement." *Id.* § 5(D)–(E); *see supra* note 9 and accompanying text.

[19] Notes, *supra* note 2, § 5(B) (emphasis added).

[20] Notes, *supra* note 2, § 6(B).

[21] Hudson Guarantees, *supra* note 6, § 1; Zysk Guarantees, *supra* note 6, § 1.

[22] Hudson Guarantees, *supra* note 6, § 4; Zysk Guarantees, *supra* note 6, § 4.

[23] Hudson Guarantees, *supra* note 6, § 10(A); Zysk Guarantees, *supra* note 6, § 10(A).

Although they have pointed to nothing to document a dispute of material fact about their liability under the Notes or Guarantees, the Individual Defendants raise several arguments as to why judgment should not be entered against them (or as to why, if judgment is appropriate, it should be entered in a particular manner). For the sake of explaining to unrepresented parties why summary judgment against them and in favor of Sun is proper, the Court makes the following observations.

* * *

Mr. Hudson claims that the Notes are not binding contracts because Sun did not have a valid guarantee with the United States Small Business Administration ("SBA") because Sun failed to comply with SBA regulations. This argument is irrelevant because Sun's alleged failure to comply with SBA regulations does not, even if true, alter the agreements (Notes) between Sun and Mr. Hudson. Mr. Hudson does not contest that he (a) understood the terms of the agreements, (b) signed the agreements in the presence of counsel, (c) received consideration per the agreements (namely, the loans), and (d), until 2010, made payments to Sun under those agreements.[24] When RCI failed to maintain tangible net worth and debt service coverage ratio covenants, and, further, failed to make payments on the Notes in 2010, RCI, as well as Messrs. Hudson and Zysk, breached their contract (the Notes), thereby triggering Sun's rights to collect and to sue to do so.

Second, Mr. Hudson's arguments that Sun has not proven damages because Sun sold part of one of the Notes and, similarly, that the guaranteed portions of the Notes have been honored by the SBA and, therefore, that Sun will receive a windfall if it is allowed to collect on the

[24] Mr. Hudson Mem. Opp. 7-8 (Docket No. 124).

Notes,[25] rest on a misunderstanding of Sun's rights and obligations. Regardless of whether Sun sells the Notes or the SBA honors its separate and independent guarantee to Sun, "[Sun] is responsible for servicing and liquidation during and after the guarantee purchase."[26] Sun is still obligated to service the Notes even though the Notes were sold to the SBA, and Sun retains the right to collect under the Notes. (And, as carefully laid out at oral argument on July 8, 2014, any party to whom Sun has sold the Notes will be estopped from seeking to collect the same amounts a second time.)

Moreover, Mr. Hudson's understanding of the SBA guarantee has problematic ramifications that he may not fully appreciate. In essence, Mr. Hudson asks the Court to accept that the SBA acts as an insurer to *borrowers* like himself such that, for the small price of $43,906.25,[27] the SBA will pay the lender (here, Sun Bank) to cover the borrowers' losses should the borrowers' business venture, for (and often against) which the money is borrowed, go under. This conception is a gross misunderstanding of the SBA's role, relationships, and purpose. The SBA operates by guaranteeing loans to reduce the risk that *lenders* would ordinarily face when dealing with small businesses. To make the point crystal clear: The SBA *guarantees the lenders*, such that, in this case, Sun Bank is not left swallowing the debt left unpaid by the borrower. Borrowers, like Mr. Hudson, benefit because they are given access to loans that, presumably, banks like Sun would either be unwilling to extend or that would be prohibitively expensive because the banks would have to charge enough to self-insure. *See, e.g.*, *SBA v. McClellan*, 364 U.S. 446, 447 (1960) (explaining that Congress gave the SBA the power of "lending money to small businesses whenever they could not get necessary loans on

[25] Mr. Hudson Mem. Opp. 14-15 (Docket No. 124 at 14-15).

[26] Mr. Hudson Mem. Opp. Ex. 6 (Docket No. 124 at 40).

[27] July 13, 2014 Hudson Letter 1 (Docket No. 132).

reasonable terms from private lenders”). Again, SBA guarantees are insurance *for the banks*, which, without these guarantees, would probably not offer arguably affordable loans in the first place. Of course, the SBA charges for providing such insurance to banks, and the banks, like Sun here, typically pass the cost of that insurance on to the borrowers—hence the $43,906.25 fee that Mr. Hudson mistakenly believes provides *him* a personal guarantee.[28] It would be remarkable (not to mention morally hazardous) indeed if, for a mere $43,906.25, an individual or business could borrow $2 million and be insured in the event he or it did not pay it back.[29]

---

[28] The relevant SBA regulations provide that “[a] Lender must pay a guaranty fee to SBA for each loan it makes,” 13 C.F.R. § 120.220, and also that “[f]or a loan with a maturity in excess of twelve (12) months, . . . [t]he Lender may charge the Borrower the fee after the Lender has made the first disbursement of the loan. The Borrower may use the loan proceeds to pay the guaranty fee,” *id.* § 120.220(b).

[29] It might be added that the SBA itself used to make loans directly to borrowers, as the Supreme Court has observed. Under one such arrangement, for example, when “a $20,000 loan was made to the debtor . . . , $5,000 came from a private bank, and $15,000 came directly from the United States Treasury” via the SBA. *Guillermety v. Sec’y of Educ.*, 241 F. Supp. 2d 727, 734 (E.D. Mich. 2002) (discussing *McClellan*, 364 U.S. at 446-48). Under these arrangements, as in the Supreme Court case mentioned, the SBA itself—that is, the United States—used to pursue defaulting borrowers. (But, of course, as this case shows, the SBA appears to have ceased this onerous and expensive practice.) The SBA did not guarantee the loans that it made to borrowers; that would be a comical suggestion, indeed.

But what appears to have always been true is that the SBA’s guarantees—of those funds lent to borrowers by banks—have been agreements between the lending institutions and the SBA, and have been entirely independent of, and have created no rights in, the borrowers. This Court is not the first to make this observation. Consider:

> The third issue which Defendants attempt to raise by their Amended Answer is that the SBA is a co-guarantor with them of the notes and obligations in question and thus Defendants’ liability as guarantors is limited. This is not a viable defense for the reason that the SBA and the Defendants are not co-guarantors as alleged. The relationship of the SBA and a bank with whom it enters into a Participation Agreement is one of guaranty. *St. Petersburg Bank & Trust Co. v. Boutin*, 445 F.2d 1028 (Fifth Cir. 1971). However, it is an independent guaranty agreement between the bank and the SBA.

*United States v. Perkins*, 71 F.R.D. 22, 24 (E.D. Okla. 1975); *accord, e.g.*, *United States v. Martin*, 344 F. Supp. 350, 356 (E.D. Mich. 1972) (“This agreement was between the bank and the SBA and created no right in the Defendants.”).

Other observations relevant to this case have also been made before:

Finally, Mr. Hudson's argument that Sun has not sustained damages because it has not collected on its default judgment against RCI misunderstands the parties' agreement and the law. As noted above, the Notes explicitly provide that Sun may "[c]ollect all amounts owing from *any* Borrower or Guarantor."[30] Sun is not required to collect from any other individual or entity before seeking payment from Mr. Hudson.

For these reasons, summary judgment should be and is granted against Mr. Hudson in favor of Sun, as set out below.

* * *

Mrs. Hudson's argument that she relied on statements made by a Sun Bank representative regarding her liability under the Guarantees fails not only because the Unconditional Limited Guarantee ("Hudson Guarantee") explicitly states that she "may not use an oral statement to contradict or alter the written terms of . . . this Guarantee, or to raise a defense to this Guarantee,"[31] but also because "[i]n a written contract the intent of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the

---

> It does not appear that the Loan agreement was written for the benefit of the personal guarantors. The provisions of the Loan agreement outlining the administration of the loan and the duties of the lender and the borrower were for the benefit of the SBA. These requirements reduced the chances that the borrower would default and that the SBA guaranty would be enforced by the Lender. *Any benefits that the personal guarantors derived from the Loan agreement were merely incidental.*

*United States v. Healy*, 923 F. Supp. 1424, 1429 (D. Kan. 1996) (emphasis added) (citing *Martin*, 344 F. Supp. at 356).

[30] Notes, *supra* note 2, § 5(B).

[31] Hudson Guarantees, *supra* note 6, § 10(H); Zysk Guarantees, *supra* note 6, § 10(H).

express language of the agreement." *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973); *accord, e.g.*, *Murphy*, 777 A.2d at 429.[32]

Second, Mrs. Hudson's Guarantees require that she "pay all amounts owing under this Guarantee when Lender [Sun] makes written demand upon Guarantor [her]."[33] For the reasons discussed above, the involvement of the SBA as a guarantor does not relieve Mrs. Hudson of liability.[34] Further, Mrs. Hudson agreed during oral arguments that her only concern was that she "didn't have another part of this judgment" other than her interest in the collateral pledged.[35] Because Mrs. Hudson's Guarantees expressly limit Mrs. Hudson's liability to her "community property or spousal interest in collateral pledged to secure the Note or any guarantee,"[36] Mrs. Hudson's liability on her Guarantees is limited to the lesser of either the outstanding debt or the value of her community or spousal interest in the collateral she pledged.

---

[32] The contention fails for other reasons, as well. For one, the contention is not properly raised. Mrs. Hudson points to no record evidence when she contends that James Martin, a Sun Bank Vice President, told her that "Sun did not expect [her] to pay the loan as the document was designed to prevent [her] husband . . . from hiding assets in [her] name." Mrs. Hudson Opp. 6 (Docket No. 123). Second, however, even if this contention were properly raised as, say, a fraud-in-the-inducement argument, Mr. Martin's statements, as Mrs. Hudson alleges them, do not even appear to be false. In fact, the Guarantees Mrs. Hudson signed *limit* her liability to those specified assets (her home and investment accounts) that she shares (or shared) with her husband, and she cannot, under her Guarantees, be "expect[ed] to pay the loan" per se, because her liability does not extend to the full value of the loan.

[33] Hudson Guarantees, *supra* note 6, § 1.

[34] *See supra* note 29 and accompanying text.

[35] July 8, 2014 Tr. N.T. (Rough Draft) 17:20–23.

[36] Hudson Guarantees, *supra* note 6, § 4.

* * *

Mrs. Zysk is in the same boat as Mrs. Hudson, but her main contention[37] in opposition to summary judgment, by contrast, is that a judgment against her for $2,500,241.57[38] but limited to her community or spousal interest in the pledged collateral is inappropriate. The Court stresses again—as at oral argument—that under no circumstances may Sun collect from Mrs. Zysk more than the value of her community or spousal interest in the collateral she pledged; the Guarantees themselves explicitly provide as much. However, the Guarantees are defined by the amount of the outstanding debt—i.e., "all amounts owing under the [corresponding] Note,"[39] or, in Sun's estimation, $2,500,241.57.[40] Thus, Sun is fully entitled to collect *up to* the amount of the outstanding debt, such as in the unlikely event that the value of the collateral exceeds the amount of the outstanding debt. The judgment here will therefore reflect the binding agreement explicitly

---

[37] Other of Mrs. Zysks's arguments have already been addressed by the foregoing discussion. For instance, even assuming that Mrs. Zysk has properly raised it, her argument that Sun's alleged failure to comply with SBA regulations fails because there is no indication that the SBA regulations grant any enforceable rights to borrowers. Second, Mrs. Zysk's apparent argument that she was "required" to sign the Guarantees improperly ignores the fact that she could have refused to sign. (In which case, Sun might have refused to provide the loans—but, of course, the Individual Defendants had no *entitlement* to the loan in the first place. By signing the Guarantees, Mrs. Zysk agreed to their terms, and she cannot now complain on grounds of regret.) Finally, Mrs. Zysk's argument that Sun has not sustained damages is without merit. Sun has lost over two million dollars on the Individual Defendants, and the Defendants are not entitled to tell Sun how to go about seeking to recoup these amounts. (Furthermore, Mrs. Zysk's Guarantees explicitly state that "Guarantor must pay all amounts owing under this Guarantee when Lender makes written demand upon Guarantor. *Lender is not required to seek payment from any other source before demanding payment from Guarantor*." Zysk Guarantees, *supra* note 6, § 1 (emphasis added). The Guarantee also states that the Guarantor waives the defense that she "did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor." *Id.* § 7(C)(12).)

[38] This is not the amount of judgment, *see infra* note 41 and accompanying text, although, presumably, Mrs. Zysk would renew this same argument with regard to the figure Sun and Mr. Hudson have agreed upon.

[39] Hudson Guarantees, *supra* note 6, § 1; Zysk Guarantees, *supra* note 6, § 1.

[40] *See supra* note 38; *infra* note 41 and accompanying text.

laid out in the Guarantees. The Court is constrained to require the parties to honor their agreement.

* * *

On July 23, 2014, "in the interest of judicial economy and with the hope of finally resolving this matter without wasting any more of this Court's or the parties' time," Sun consented to, although disagreeing with, "Mr. Hudson's calculation of the amount due as $2,151,223.28" and asked that the Court enter judgment against all the Individual Defendants in that amount (subject, in Mmes. Hudson's and Zysk's cases, to the limitations to the value of their respective interests in the collateral pledged).[41] Given that Sun's calculation amounted to $2,500,241.57, Sun's gesture is an entirely reasonable compromise that accrues to the benefit of all parties involved.

**For the foregoing reasons, the Court will grant summary judgment in favor of Sun and against Arthur and Theresa Hudson and Lorraine Zysk in the amount of $2,151,223.28. The three Individual Defendants shall be jointly and severally liable with each other and RCI, against which judgment was entered previously. As discussed above, however, the liability of each of Mmes. Hudson and Zysk is limited to the respective value of her interest in the collateral she pledged, i.e., the value of each woman's interest in her home.**

An appropriate Order of Judgment will be entered.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

[41] July 23, 2014 [mislabeled 2013] Sun Letter 1 (Docket No. 133).